## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

WALTER L. JOHNSON,

       Petitioner,

v.                                        Case No. 3:21-cv-811-TJC-SJH

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

       Respondents.

_____

## **ORDER**

### I.   **Status**

Petitioner Walter L. Johnson, an inmate of the Florida penal system, initiated this action by filing a pro se Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254. See Doc. 1. Petitioner challenges a state court (Duval County, Florida) judgment and conviction for sexual battery on a victim less than 18 years of age (count one), and battery, a lesser included offense of sexual battery (count three). Petitioner is serving a cumulative thirty-one-year term of incarceration as a sexual predator. Respondents filed a Response. See

Doc. 7 (Resp.).[1] Petitioner replied. See Doc. 8. This case is ripe for review.[2]

## II.    <u>Governing Legal Principles</u>

### A. Standard Under AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. See <u>Ledford v. Warden, Ga. Diagnostic & Classification Prison</u>, 818 F.3d 600, 642 (11th Cir. 2016), <u>cert. denied</u>, 137 S. Ct. 1432 (2017). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" <u>Id.</u> (quoting <u>Greene v. Fisher</u>, 565 U.S. 34, 38 (2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. See <u>Marshall v. Sec'y Fla. Dep't of Corr.</u>, 828 F.3d 1277, 1285 (11th Cir. 2016). The

---

[1] Attached to the Response are various exhibits. The Court refers to the exhibits as "Resp. Ex."

[2] "In a habeas corpus proceeding, the burden is on the petitioner to establish the need for an evidentiary hearing." <u>Jones v. Sec'y, Fla. Dep't of Corr.</u>, 834 F.3d 1299, 1318 (11th Cir. 2016) (citing <u>Chavez v. Sec'y Fla. Dep't of Corr.</u>, 647 F.3d 1057, 1060 (11th Cir. 2011)). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." <u>Schriro v. Landrigan</u>, 550 U.S. 465, 474 (2007) (citation omitted). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." <u>Id.</u> The Court finds that "further factual development" is unnecessary. <u>Turner v. Crosby</u>, 339 F.3d 1247, 1275 (11th Cir. 2003). Thus, an evidentiary hearing will not be conducted.

state court need not issue an opinion explaining its rationale for the state court's decision to qualify as an adjudication on the merits. See Harrington v. Richter, 562 U.S. 86, 100 (2011). When the state court's adjudication on the merits is unaccompanied by an explanation,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court cannot grant habeas relief unless the state court's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(1), (2). A state court's factual findings are "presumed to be correct" unless rebutted "by clear and convincing evidence." Id. § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt."

Renico v. Lett, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. [at 102] (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. See, e.g., Mitchell v. Esparza, 540 U.S. 12, 18 (2003); Lockyer, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); Williams v. Taylor, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

Bishop v. Warden, GDCP, 726 F.3d 1243, 1253-54 (11th Cir. 2013) (internal citations modified).

## B. Ineffective Assistance of Trial and Appellate Counsel

"The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. That right is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (citing Wiggins v. Smith, 539 U.S. 510, 521 (2003); Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish ineffective assistance, a person must show: (1) counsel's performance was outside the wide range of reasonable,

professional assistance; and (2) counsel's deficient performance prejudiced the challenger in that there is a reasonable probability that the outcome of the proceeding would have been different absent counsel's deficient performance. Strickland, 466 U.S. at 687.

This two-part Strickland standard also governs a claim of ineffective assistance of appellate counsel. Overstreet v. Warden, 811 F.3d 1283, 1287 (11th Cir. 2016). When considering deficient performance by appellate counsel,

> a court must presume counsel's performance was "within the wide range of reasonable professional assistance." Id. at 689, 104 S. Ct. 2052. Appellate counsel has no duty to raise every non-frivolous issue and may reasonably weed out weaker (albeit meritorious) arguments. See Philmore v. McNeil, 575 F.3d 1251, 1264 (11th Cir. 2009). "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." Smith v. Robbins, 528 U.S. 259, 288 (2000) (quoting Gray v. Greer, 800 F.2d 644, 646 (7th Cir.1986)); see also Burger v. Kemp, 483 U.S. 776, 784 (1987) (finding no ineffective assistance of counsel when the failure to raise a particular issue had "a sound strategic basis").

Id.; see also Owen v. Sec'y, Dep't of Corr., 568 F.3d 894, 915 (11th Cir. 2009) ("failing to raise or adequately pursue [meritless issues on appeal] cannot constitute ineffective assistance of counsel").

To satisfy the prejudice prong of an ineffective assistance of appellate counsel claim, a petitioner must show a reasonable probability that "but for the deficient performance, the outcome of the appeal would have been different."

5

Black v. United States, 373 F.3d 1140, 1142 (11th Cir. 2004); see also Philmore

v. McNeil, 575 F.3d 1251, 1264-65 (11th Cir. 2009) (prejudice results only if "the

neglected claim would have a reasonable probability of success on appeal").

Also,

> [a] reasonable probability is a probability sufficient to
> undermine confidence in the outcome." Id., at 694, 104
> S. Ct. 2052.  It is not enough "to show that the errors
> had some conceivable effect on the outcome of the
> proceeding." Id., at 693, 104 S. Ct. 2052. Counsel's
> errors must be "so serious as to deprive the defendant
> of a fair trial, a trial whose result is reliable." Id., at
> 687, 104 S. Ct. 2052.

Richter, 562 U.S. at 104. As such, "[a]ppellate counsel might fail to identify a

mediocre or obscure basis for reversal without being ineffective under

Strickland." Overstreet, 811 F.3d at 1287 (citation omitted).

    For both claims of ineffective assistance of trial counsel and appellate

counsel, there is no "iron-clad rule requiring a court to tackle one prong of the

Strickland test before the other." Ward v. Hall, 592 F.3d 1144, 1163 (11th Cir.

2010). Since both prongs of the two-part Strickland test must be satisfied to

show a Sixth Amendment violation, "a court need not address the performance

prong if the petitioner cannot meet the prejudice prong, and vice-versa." Id.

(citing Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in

Strickland: "If it is easier to dispose of an ineffectiveness claim on the ground of

lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697.

Further, "[t]he question is not whether a federal court believes the state court's determination under the <u>Strickland</u> standard was incorrect but whether that determination was unreasonable - a substantially higher threshold." <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard," then a federal court may not disturb a state-court decision denying the claim. <u>Richter</u>, 562 U.S. at 105. As such, "[s]urmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010). "Reviewing courts apply a 'strong presumption' that counsel's representation was 'within the wide range of reasonable professional assistance.'" <u>Daniel v. Comm'r, Ala. Dep't of Corr.</u>, 822 F.3d 1248, 1262 (11th Cir. 2016) (quoting <u>Strickland</u>, 466 U.S. at 689). "When this presumption is combined with § 2254(d), the result is double deference to the state court ruling on counsel's performance." <u>Id.</u> (citing <u>Richter</u>, 562 U.S. at 105); <u>see also</u> <u>Evans v. Sec'y, Dep't of Corr.</u>, 703 F.3d 1316, 1333-35 (11th Cir. 2013) (en banc) (Jordan, J., concurring); <u>Rutherford v. Crosby</u>, 385 F.3d 1300, 1309 (11th Cir. 2004).

## III.  **Factual and Procedural Background**

The following factual and procedural background are taken from

Petitioner's initial brief filed on direct appeal:

> Mr. Johnson was arrested for the charges at issue here after a physical examination in December 2014 revealed that the victim, A., was pregnant, and she identified Mr. Johnson as the father. Mr. Johnson was acquainted with A.'s grandmother, Janice Campbell, and had developed a relationship with Ms. Campbell's extended family. Based on DNA testing that confirmed A.'s allegation of paternity Mr. Johnson did not deny having any sexual contact with her, but denied remembering it, and maintained that his history of mental illness was to blame. The facts below begin with a summary of lengthy pretrial proceedings during which Mr. Johnson sought several times to discharge appointed counsel and raise an insanity defense. The pretrial proceedings are followed by a summary of trial testimony and the results of Mr. Johnson's sentencing hearing.

> . . . .

> Mr. Johnson was charged by Information with committing three acts of sexual battery on A. between the dates of April 15, 2014 and June 30, 2014. On October 28, 2015, before Judge Tatiana Salvador, defense counsel informed the court Mr. Johnson was requesting a <u>Nelson</u>[3] hearing. The court conducted an inquiry, and Mr. Johnson identified several areas where he felt he was receiving ineffective assistance of counsel: counsel had not ordered an additional DNA test of A's child; counsel had failed to obtain documents from the Veteran's Administration dating to [] 1975, when Mr. Johnson said he was discharged from the military for mental health issues; and counsel had advised Mr. Johnson to take a plea while an intern was present. In addition, Mr. Johnson stated he had been evaluated for competency "for 20 minutes," which he felt was insufficient.

---

[3] <u>Nelson v. State</u>, 274 So. 2d 256 (Fla. 4th DCA 1973).

Defense counsel informed the court he was willing to hire an expert to review the State's DNA test results and advise him as to whether it would be worth having a second DNA test performed; reviewed the steps his office had taken to obtain medical records from the VA; confirmed that he advised Mr. Johnson to "strongly consider" a plea and that an intern was present during some of their meetings; and told the court Mr. Johnson had been evaluated for both competency and a possible insanity defense by Dr. Meadows on behalf of the defense. Based on Dr. Meadows' evaluation, counsel stated, "I do not have any motions to file related to competency, nor do I have any notices based on that evaluation relating to insanity at the time of the offense." Mr. Johnson told the court he was taking medication for his mental health, including Seroquel, and that he was hearing voices.

The court reviewed Mr. Johnson's complaints and found he was not receiving ineffective representation. The court informed him there were three options: (1) to continue with appointed counsel; (2) to hire counsel at his own expense; or (3) to represent himself, if the court found he was competent to do so. Mr. Johnson asked for additional time to consider his options, and the court continued the case to the following week. The docket reflects that Mr. Johnson elected to keep his appointed counsel at that point.

However, Mr. Johnson renewed his complaints about appointed counsel on January 19, 2016, at another pretrial proceeding before Judge Salvador. Mr. Johnson had filed a pro se notice of intent to rely on an insanity defense before that court date, and counsel stated he was not adopting the notice. Counsel informed the court he had retrieved additional records relating to Mr. Johnson and forwarded them to the defense medical expert, and still had no motions to file. Counsel also stated Mr. Johnson had prepared a motion

for bond reduction. The court stated that would have to be set for a separate hearing, as it had just been filed. When the court began to review Mr. Johnson's complaints, he stated he was hearing voices. The court stated it was cause for concern that on two different occasions Mr. Johnson had told the court he was hearing voices. The court did not make a specific finding regarding counsel's performance, in part because counsel needed time to review the proposed motion for bond reduction.

On February 29, 2016, before Judge Steven Whittington, Mr. Johnson renewed his request that counsel be discharged, and stated he would represent himself if necessary. The court conducted a <u>Nelson</u> inquiry and determined Mr. Johnson was not receiving ineffective representation. During that inquiry Mr. Johnson stated "I have a lot of psychiatric records showing that I have blackouts. I suffer from hallucinations and delirium and I hear voices every day, sir. And I'm on psychotropic medication, and they are not giving me all the medication . . . ." The court then began a <u>Faretta</u>[4] inquiry, but suspended the <u>Faretta</u> inquiry after Mr. Johnson said he was still hearing voices.

On March 3, 2016, the court signed an Order Appointing Experts for Competency Evaluation and Notice of Hearing, setting a hearing date of March 18. At the hearing on March 18 the court received a written report on a competency evaluation performed by Dr. Neidigh. The court recounted the following explanation for ordering the evaluation:

> [On February 29, 2016,] at the conclusion of that <u>Nelson</u> hearing, I found that there was no reasonable grounds to remove the public defender from the case. Then Mr. Johnson indicated that he wished

---

[4] <u>Faretta v. California</u>, 422 U.S. 806 (1975).

to represent himself, and I began a <u>Faretta</u> hearing, and short [sic] the end of that hearing Mr. Johnson indicated by his words and by his actions, that is, covering his head with his hands and bending over and saying he was hearing voices, I stopped the <u>Faretta</u> hearing. We passed the case to March the 2nd to determine whether or not I would appoint an expert to examine Mr. Johnson, I did, and I appointed Dr. Neidigh, who diligently got on the case and met with Mr. Johnson and drafted a report consistent with his — following up with his meeting with Dr. — with Mr. Johnson. And the date of that evaluation was March the 8th, 2016, and that was forwarded to me and to counsel for the State and counsel for the defendant, as just announced by the parties.

And the findings in essence of that report, is that Mr. Johnson was competent to proceed; that Dr. Neidigh's opinion that there might be some psychiatric issues with Mr. Johnson; and that there in fact were some, but that he was exaggerating them in that meeting, and found him competent to proceed.

So, now, we are back for the next scheduled court date, which is today, March the 18th.

So, I guess, the next inquiry should be to Mr. Johnson as to how he wishes to proceed.

Mr. Johnson acknowledged receiving Dr. Neidigh's report, and said he still wanted to represent himself. The court resumed the <u>Faretta</u> hearing and eventually found that Mr. Johnson was competent to waive counsel. During the hearing Mr. Johnson told the court he had diagnoses of schizophrenia, bipolar disorder, auditory hallucinations, delusions, anxiety,

panic attacks, and out-of-body experiences. The Public Defender was appointed as standby counsel. The appointment was later confirmed in a written Order Appointing Standby Counsel dated March 18, 2016.

Mr. Johnson immediately resubmitted his motion for reduction of bond and notice of intent to rely on insanity defense. The court told him both matters would be set for a hearing on March 21, 2016.

On March 21, the State called Janice Campbell, who stated she met Mr. Johnson in 1972 in the Navy. In approximately 2007 he came back into her life; her understanding was that he was in jail during the intervening time. Mrs. Campbell stated she was A.'s legal guardian, and that she would fear for A.'s safety if Mr. Johnson were released. When asked why, she stated "Because that was very wrong, what he did to my grandbaby. I feel it would be hurtful to her and my family, because that was very wrong what he did to my baby." Mrs. Campbell stated she and a cousin named William were Mr. Johnson's only ties to Jacksonville.

Before Mr. Johnson questioned Mrs. Campbell the court asked him whether he still wanted to represent himself; he replied affirmatively. He also told the court he was not hearing voices and he understood he was present for a bond hearing. Mr. Johnson then asked Mrs. Campbell "Are you aware that I have several mental illnesses?" She replied "You don't have no mental illness, nothing. The only mental illness is touching my baby." He continued to question her about whether she had told other people he was "crazy," and she denied it. When he asked the court how he could impeach her, the court stated "Mr. Johnson, I'm not going to try your case for you. You're your own lawyer now." Mr. Johnson then accused Mrs. Campbell of perjuring herself. The court denied his motion for a reduction in his bond.

After a short discussion of outstanding discovery,

the State referenced the notice of insanity defense:

> One of the other issues at this point is he has filed his notice of intent to rely on insanity defense, which I think his notice is not legally sufficient as is, but should he amend it for it to be legally sufficient, that would involve some additional discovery in that his notice at this point, number one, is untimely.
>
> But, number two, he does not allege the specific way that he was insane at the time other than just saying he was insane. For example, he does not list any sort of specific mental condition that contributed to his assertion that he's insane, nor does he list involuntary intoxication or anything along those lines.
>
> So it's my belief that it is insufficient — because of that, in addition, he has not listed, even though he has alleged he has numerous witnesses, he has not listed any witnesses in his notice to put the State on notice of that.
>
> So for these reasons, I would say that his notice at this point is legally insufficient. I think the remedy for that provided in the rules is for him to amend it at which time he does have a legally sufficient notice.

The trial court then informed Mr. Johnson that the notice of insanity defense submitted on March 18, 2016 was "facially insufficient for the reasons cited by [the State]." The court added that Mr. Johnson could consult court rules and discuss the matter with standby counsel if he wished to file a facially sufficient notice. Mr. Johnson stated he would be amending the notice with 30 to 35 witnesses. He also requested increased access to the law library, but the court reminded him he would receive no additional privileges just because

he was representing himself.

On March 30, 2016, the court entered an Order Striking Defendant's Pro Se Notice of Intent of Insanity Defense. The order noted "The Defendant's pro se notice fails to allege the nature of the insanity he purportedly suffers from, other than stating he cannot recall the incident in question. Further, the notice does not contain the names of any witnesses by whom the Defendant expects to prove an insanity defense."

Mr. Johnson was in court again on April 28, 2016, when the offer of counsel was renewed and declined. Mr. Johnson told the court he needed to conduct various depositions relating to his insanity defense. The court responded "Well, Mr. Johnson, right now that is no defense. I struck your notice." Mr. Johnson stated he was trying to prepare the notice:

> DEFENDANT: I'm going to file that as soon as I get everything in order because I'm trying to get my expert witnesses. I'm trying to get my expert witnesses before I put them in the motion. By the rules, I think it is 30 days that I have to file it because I get to trial. So right now I'm trying to get everything lined up so that I do put in a motion for insanity plea. I will have everything probably done.
>
> THE COURT: When do you plan on doing that?
>
> DEFENDANT: Well, I'm asking for a continuance, sir, so I can have everything properly done.

The court denied his request for a continuance and gave him another court date a week later. Approximately one week later the State filed an Amended Information.

On June 3, 2016 Mr. Johnson returned to court and entered a plea to the Amended Information. The offer of counsel was renewed and declined. Additionally, on June 3, 2016, Defendant filed an amended Pro Se Notice of Intent of Insanity Defense. In the Notice, Defendant stated that he suffered from schizophrenia, other psychotic disorders, bipolar disorder, major affective disorder, and post-traumatic stress disorder. The Notice also listed 23 specific dates on which Defendant had been treated for mental health issues and the names of doctors or psychologists he had seen on each treatment date. The State and trial court discussed the amended notice, with the State noting that it included names but no addresses or phone numbers. Mr. Johnson subsequently filed a motion for payment of the cost of an expert witness/psychologist asking for the court to pay for Dr. Jerry Valente to examine Mr. Johnson, review medical records, and testify at trial.

On June 7, 2016, Mr. Johnson was in court again for a deposition of the victim. The offer of counsel was renewed and declined. Following the deposition of the victim, the court took up Mr. Johnson's request to depose detectives who had stated he was suicidal when taken into custody. The detectives had been deposed when Mr. Johnson was still represented by counsel, and the court stated there was no good cause to depose them a second time. The court and Mr. Johnson also discussed his ongoing efforts to obtain his medical records. At the end of the hearing the court stated the Information had been amended; the State said the amendment narrowed the range of dates alleged. The court asked Mr. Johnson whether he entered a plea of guilty or not guilty, and he responded "Not guilty by reason of insanity."

On June 24, 2016, Mr. Johnson filed an Addendum listing "addresses of the (3) three Psychologist and (25) Psychiatrist previous listed and filed with this Honorable Court." The Addendum listed

addresses for the Jacksonville Outpatient Clinic in Jacksonville, Florida, and Miami Veteran's Hospital in Miami, Florida. On July 14, 2016, the court granted Mr. Johnson's motion to incur the costs of an expert witness, Dr. Jerry Valente.

However, on July 15, 2016, when Mr. Johnson returned to court, the court revoked the order granting his request to represent himself after Mr. Johnson stated he was hearing voices. The Public Defender was reappointed over Mr. Johnson's objection. Mr. Johnson noted he had a pending examination with Dr. Valente. Despite this information, the court vacated its order regarding incurring the cost of an expert witness, stating that the Office of the Public Defender had been re-appointed to represent Mr. Johnson and would determine whether a further examination was required. Counsel agreed that the order could be revoked pending further investigation. Counsel stated he would talk to Mr. Johnson's investigator before his office would incur the cost of an expert evaluation.

. . . .

On July 25, 2016, Mr. Johnson filed another Motion for <u>Nelson</u> Hearing. The court held a <u>Nelson</u> hearing on August 25, 2016. After reviewing Mr. Johnson's complaints about appointed counsel, and hearing from counsel, the court found counsel was not being ineffective and declined to remove him. Mr. Johnson stated he wanted to represent himself. The court proceeded to conduct a <u>Faretta</u> inquiry during which it reminded Mr. Johnson of the risks of self-representation and the advantages of counsel, and asked questions about Mr. Johnson's ability to understand the proceedings. During that inquiry Mr. Johnson denied hearing any voices other than his own and the judge's.

The court referenced Dr. Neidigh's earlier finding that Mr. Johnson was competent to proceed when

finding he was competent to waive counsel and represent himself. The Public Defender was re-appointed as standby counsel. . . .

On November 3, 2016, at another pretrial proceeding, the court confirmed with Mr. Johnson that he wished to continue to represent himself. The State represented that Mr. Johnson had not yet listed "any medical doctor or any psychologist, any mental health professional" who would provide information relating to a defense of insanity. The court received and denied a Motion to Dismiss [for] Due Process Rights Violations The court also asked Mr. Johnson whether he wanted the court to sign an order appointing Dr. Valente to conduct an evaluation relating to the insanity defense, and Mr. Johnson declined that offer. On November 28, 2016 Mr. Johnson filed a Motion to Incur Cost for a Psychologist asking for the appointment of Sherry Risch.

On December 1, 2016, at a final pretrial conference, the offer of counsel was renewed and declined. The court put on the record that the State was willing to dismiss Counts 2 and 3 of the Information and allow Mr. Johnson to plead guilty to Count 1; he declined the offer. After a discussion of records Mr. Johnson still had not been able to obtain, the court made the following statement:

> For the record, I'm making the finding that I never thought Mr. Johnson was not competent. I thought his claim to be hearing voices was made up, not legitimate.
> I saw that happen in January when I was here shadowing Judge Salvador, and I saw it myself on occasions. And I'm making that finding.

On December 5, 2016, the parties were present for jury selection. . . . The court presided over voir dire

17

and jury selection with the Public Defender present as standby counsel. The offer of counsel was renewed before jury selection. The State abandoned Count 2 (alleged anal penetration).

Mr. Johnson declined to wear the street clothes standby counsel had brought for him, preferring to remain in jail attire. However, his handcuffs were removed before the venire was brought into the courtroom. When Mr. Johnson asked whether he would be able to raise the defense of temporary insanity, the court did not immediately respond:

> MR. JOHNSON: Also, sir, I would like to know if my motion of not guilty because of temporary insanity is — is viable. I mean, that's going to be my defense, even though I won't have any records, so that I can raise that issue. Am I correct?

> THE COURT: State, anything else? [The State then reviewed information relating to witnesses and jury instructions, and informed the court it was abandoning Count 2.]

> MR. JOHNSON: So you didn't answer my question, sir.

> THE COURT: State your position as to the insanity defense.

> STATE: Your Honor, the State is not agreeing with the insanity defense. There has been no medical expert presented as well there has been no other witness presented. In addition, there's not been any legal — legally sufficient notice of any intent to proceed on that defense.

After further discussion the court stated no

notice had been served as required by Florida Rule of Criminal Procedure 3.216:

> THE COURT: No such notice has ever been provided. I had one notice filed by the defense pro se that I struck as legally insufficient. There was one prior to that, also filed pro se, that Mr. Armstrong who was then representing you, Mr. Johnson, refused to adopt after having considered the report of Dr. Meadows that was specifically sought in order to establish whether or not such a defense would be viable.

Mr. Johnson said he had amended his notice, but the court responded "I entered a written order on that." When the court cautioned him to avoid any outbursts a few minutes later, he said "I always hear voices, sir. So what that has to do with anything? I always hear voices and I got a dog named Butch that — well, okay."

> . . . .

In opening statements Mr. Johnson did not dispute that he fathered a child with the victim, but said there were "circumstances" including his military service in the 1970s and that he had been on disability ever since. When he asked the court "Can I say I take psychiatric medication?" the court again reminded him that he could not talk about psychiatric issues. When Mr. Johnson persisted in asking why he could not raise his only defense, the court sent the jury out and admonished him.

The first witness was Diana Johnson, M.D., a physician with Family Care Partners in Jacksonville. She stated A. came to her office on December 31, 2014, with two adults, one of whom was Defendant. Dr. Johnson administered a pregnancy test, which was positive. Dr. Johnson asked A. "you've had sex," and she

said A. responded "yes, with that man," pointing to the exam room next door, where Defendant was sitting. Dr. Johnson asked Defendant to leave the exam room and had a member of the staff contact law enforcement.

The next witness was Dr. Larae Brown, an obstetrician and gynecologist with St. Vincent's Healthcare. Defendant declined the opportunity to depose Dr. Brown in advance of her testimony. She testified that she reviewed [A.]s medical records on January 2, 2015; the purpose of [A.]'s appointment was to confirm her pregnancy and establish gestational age. After an ultrasound, Dr. Brown was able to determine gestational age, and from that was able to determine that the date of conception was approximately June 13, 2014, "plus or minus three weeks."

The next witness was A.; the courtroom was cleared for her testimony.

A. agreed that, in 2014, when the alleged offenses took place, Mr. Johnson was a strong male figure in her life. He often stayed at her house, and she was expected to listen to him when he was there. A. stated that sometime after her birthday in May 2014 she was alone with him while she was ill with strep throat. She was watching television in her nightgown when he came into the room, took off his clothes, and "forced his body on me." She said he put his mouth "on the lower front part of my body" and then "put his private part in my front part of my private part." It hurt, but she could not scream because his hand was over her mouth. After he got off her, she went into the bathroom, where she saw "blood and . . . white stuff on me." She did not tell anyone in her family for a long time.

When A. went to see Dr. Johnson, her pediatrician, later in 2014, Dr. Johnson asked whether anybody had touched her; at first she did not answer, but then she pointed to Mr. Johnson. Dr. Johnson told A. that A. was pregnant; until then, A. had no idea. A.

talked to Detective Baker about what had happened and let Detective Baker take a DNA sample from her. After the baby was born Detective Baker took a DNA sample from the baby as well.

On cross-examination Defendant asked A. whether she remembered making a statement that he was "acting strange" during the incident, and she said she did. He then asked "do you have any idea how very sorry I am that that incident occurred?" and the court sustained an objection to counsel testifying. Defendant then repeated "do you recall that you said I was acting very strange?" and the court sustained an objection that the question had already been asked and answered. Defendant had no further questions of A.

Detective Larry Baker, of the Jacksonville Sheriff's Office, testified that he responded to the Family Care Partners medical clinic on December 31, 2014, where he met with A. and some family members. He also met Mr. Johnson and eventually took a DNA sample from Mr. Johnson, with Mr. Johnson's consent. Along with taking DNA samples from A. and her baby, and arresting Mr. Johnson, that was the extent of Detective Baker's involvement in the case.

On cross-examination Mr. Johnson asked whether it was true that Mr. Johnson made contact with the police himself, and Detective Baker agreed he had. The court sustained an objection to prevent Mr. Johnson from asking whether Detective Baker's report noted that Mr. Johnson had "any observable mental health problems." When Mr. Johnson continued asking questions relating to Detective Baker's knowledge of his mental health issues, the court sent the jury out and admonished Mr. Johnson that "[t]he defense of insanity is not going to be a defense that you're going to be allowed to use in this case, for the reasons I've already stated." During the conversation that followed Mr. Johnson told the court he had been hospitalized in the past and that, when he was arrested, he was placed in

the mental health ward. The court reiterated that no legally sufficient notice of insanity defense had ever been filed. When Mr. Johnson said he had amended the notice the court did not comment further, but asked him whether he had any other questions for Detective Baker that did not involve his mental health. After the jury returned the court sustained a hearsay objection to asking Detective Baker whether Mr. Johnson had made certain statements during his interview, but allowed Mr. Johnson to elicit testimony from Detective Baker that Mr. Johnson had been cooperative.

. . . .

[After the State rested,] Mr. Johnson [ ] protested the court's decision to prevent him from using an insanity defense, stating that he had amended his notice. He stated he did not want to testify. The court reviewed the jury instructions with the parties. Mr. Johnson twice asked that the jury instructions "reflect that defendant has entered a plea of not guilty by reason of insanity." The court responded "That request is denied for the reasons already stated." Regarding the verdict form, Mr. Johnson asked to include on the verdict form a choice that "we, the jury, find the defendant not guilty by reason of insanity." That request was also denied. When the jury returned to hear closing arguments, the court asked Mr. Johnson whether he had anything to say for the record, and Mr. Johnson repeated "I really wanted that to include that not guilty by reason of insanity." The court responded "Mr. Johnson, we're not going there . . . [d]o you announce rest?" Mr. Johnson stated "I announce rest."

When Mr. Johnson was given the opportunity to present a closing argument he began by apologizing to the family, then reminded the jury A. had said he was acting "strange." When he stated "Myself, I don't recall or remember that," the court sustained an objection. As Mr. Johnson continued the court again admonished him to confine himself to facts in evidence. When Mr.

Johnson stated "I'm diagnosed with severe mental illness, including, but not limited to, schizophrenia," the court told him to sit down. Mr. Johnson then stated the judge was a member of the illuminati and that he was hearing voices, at which point the judge had him removed from the courtroom. The jury was charged without him being present. Mr. Johnson was brought back to hear the verdict.

. . . .

After the verdict Mr. Johnson stated he was hearing voices that were "overwhelming" him, and the court revoked his right of self-representation. The court then reappointed the Public Defender's office, and standby counsel requested a PSI because of Mr. Johnson's lack of prior convictions.

. . . .

[At sentencing,] [d]efense counsel presented a motion for new trial and, in addition, adopted a pro se motion for new trial Mr. Johnson had filed. The court denied both motions. The court heard testimony via telephone from Nicole Johnson, Mr. Johnson's daughter. Ms. Johnson stated that her father's mental health difficulties had become worse during the trial. The defense also called Mr. Raj Gupta, an inmate at the Duval County Jail, who testified he had become acquainted with Mr. Johnson and observed characteristics of someone with mental problems.

Mr. Johnson then testified that he had no recollection of the alleged offenses, and attempted to tender a medical report relating to his mental health diagnosis. The court sustained an objection on the grounds that the report was old and not authenticated.

. . . .

After the State requested a sentence of no less

> than 30 years, Mr. Johnson addressed the court and
> reiterated that "I obviously wasn't in my right state of
> mind." He questioned why his attorney would not
> recommend a psychological evaluation, and the court
> stated "Mr. Johnson, I ordered my own psychological
> evaluation of you . . . I offered you three times, three
> times to have an evaluation done and each time you
> refused." The court instructed Mr. Johnson to confine
> his comments to his sentence. When he continued to
> raise the issue, defense counsel stated that, after being
> reappointed, he had attempted to get additional records
> directly from Mr. Johnson, and that Mr. Johnson had
> refused to provide them. Based on this refusal,
> counsel's office determined that the office would not
> pay for an additional evaluation of Mr. Johnson.
>
> The court sentenced Mr. Johnson to 30 years in
> prison for sexual battery, with credit for 751 days
> already served, to be followed by one year in the Duval
> County Jail for the misdemeanor battery.

Resp. Ex. B3 (record citations omitted).

## IV.  **The Petition**

### a. **Ground One**

Petitioner asserts the trial court erred in rejecting his pro se notices of intent to rely on an insanity defense, violating his due process rights under the Fifth, Sixth, and Fourteenth Amendments. Doc. 1 at 14-15. Respondents argue Petitioner failed to present the federal nature of this claim to the state court, and thus, it is unexhausted and procedurally defaulted. Resp. at 8-12. Alternatively, Respondents argue that even if this claim were exhausted, it lacks merit because the state court's adjudication is entitled to deference. Id. at

24-28.

The Court agrees that this claim is unexhausted because Petitioner did not present the federal nature of this claim to the state court. <u>See</u> Resp. Ex. B3. Indeed, Petitioner, with help from appellate counsel, raised this issue on direct appeal. <u>Id.</u> at 30. When briefing this issue, however, Petitioner did not state or suggest that he was raising a federal claim about due process or any other federal constitutional guarantee. <u>Id.</u> at 30-37. Instead, Petitioner argued, in terms of state law only, that the trial court abused its discretion and "improperly rejected his amended pro se notice of intent to rely on" an insanity defense where Florida Rule of Criminal Procedure 3.216 allows for exceptions to the notice requirement, including "waiver of time to file." <u>Id.</u> at 30-32 (citing <u>Shepherd v. State</u>, 453 So. 2d 215 (Fla. 5th DCA 1984); <u>Rosado v. State</u>, 650 So. 2d 681 (Fla. 2d DCA 1995)). Although Petitioner referenced the Sixth Amendment of the United States Constitution in his brief, Petitioner failed to articulate and fairly present a federal constitutional claim. Resp. Ex. B3 at 32. Notably, merely citing to the federal constitution is not enough to exhaust a claim in state court. <u>See</u> <u>Anderson v. Harless</u>, 459 U.S. 4, 7 (1982). As such, Ground One is unexhausted and procedurally defaulted, and Petitioner has not shown cause for or prejudice from this procedural bar.

Nevertheless, even if the federal nature of this claim were exhausted, it still lacks merit because the state court's adjudication is entitled to deference.

After Petitioner's trial but before sentencing, the trial court entered a thorough order outlining Petitioner's pro se requests to pursue an insanity defense and the trial court's reasoning for denying those requests. <u>See</u> Resp. Ex. B1 at 327-35. The trial court explained that Petitioner's pro se notices were insufficient and listed witnesses and experts that neither evaluated Petitioner nor could offer testimony that Petitioner was insane at the time of the offense. <u>Id.</u> at 334. It noted that the two psychologists who did examine Petitioner prior to trial (Dr. Meadows and Dr. Neidigh) both found that an insanity defense was not available; and based on Petitioner's representations to the trial court, Petitioner simply sought to introduce a voluminous amount of medical records at trial in hopes of confusing the jury and escaping the consequences of his actions. <u>Id.</u>

Also, when addressing this claim in its answer brief filed on direct appeal, the state argued the following, in pertinent part:

> Appellant failed to comply with Fla. R. Crim. Pro. 3.216 because his notice was untimely. Appellant filed his first notice of intent to rely on the defense of insanity well beyond the 15 days after his plea of not guilty was [entered]. Pursuant to Fla. R. Crim. Pro. 3.126(g), the judge may, within his discretion, grant an additional 10 days to file [a] notice. The trial court exercised its discretion in granting Appellant additional time to file a notice of intent to rely on the defense of insanity[] when it ruled on March 21st, 2016, that Appellant's notice was insufficient, and struck the [notice] with leave to amend. Appellant's next notice of intent to rely on insanity was filed May 19th, 2016, again on June 3rd, 2016 and an addendum on June

24th, 2016. All subsequent notices failed to comply with the 10-day requirement of Fla. R. Crim. Pro. 3.216(g).

Not only was Appellant's notice untimely, but his notice in [June] 2016 was legally insufficient. Pursuant to Fla. R. Crim. Pro. 3.126, "the notice shall contain a statement of particulars showing the nature of the insanity the defendant expects to prove and the names and addresses of the witnesses by whom the defendant expects to show insanity . . . ." Appellant failed to include a statement of particulars showing the nature of the insanity.

Appellant lists in his notice on [June] 3rd, 2016, that he has been diagnosed with SPMI "including, but not limited to: schizophrenia, and other psychotic disorders, bipolar disorder, major affective disorder, and PTSD." Appellant then lists dates and doctors, but fails to include any addresses. Appellant does not give any details regarding how his mental illness affected him during the crime. He merely stated legal conclusions. Stating medical diagnosis with legal conclusions does not comply with the rule and is therefore legally insufficient.

On the day of trial, Appellant stated he still did not have his records. Appellant inquired of the trial court, "I would like to know if my motion of not guilty because of temporary insanity is – is viable. I mean, that's going to be my defense, even though I won't have any records . . ." It appears from the record, that Appellant did not have an expert witness to testify whether he was insane at the time of the offense, no custodian of records subpoenaed, nor was there a motion to rely on the records. At the time of trial, Appellant had no viable way to introduce evidence that he was insane at the time of the offense.

Appellant chose to represent himself because the Office of the [P]ublic [D]efender did not file [a] notice to rely on the insanity defense. During a <u>Nelson</u> hearing,

trial counsel informed the court that Appellant had been evaluated by Dr. Meadows, and based on that report, trial counsel had no motions for competency nor [in]sanity at the time of the offense. The court specifically asked "so, he evaluated for competency and NGI?" Trial counsel at the time responded, "yes, your honor, he was. And based on the result of Dr. Meadows' evaluation, I do not have any suggestions or notices to file with the Court for mental health purposes." Subsequently, at another <u>Nelson</u> hearing, trial counsel informed the court, "right now essentially there is a difference of opinion as to the severity of those issues and whether or not they legally are sufficient to support a mental health basis defense."

Appellant was later permitted to represent himself. It is clear that Appellant chose to represent himself because trial counsel had no good faith basis to proceed with a defense of insanity and refused to present that defense without more information. Appellant was unable to competently represent himself and filed multiple untimely and legally insufficient notices.

The trial court granted Appellant ample time to receive records and prepare a defense, however, Appellant was unable to obtain those records or put the state on sufficient notice. Appellant failed to file his notice timely, and failed to include a statement of particulars. Appellant did not list how his diagnosed mental illness affected him on the day he committed the crime, so that the State could properly prepare and thus was legally insufficient.

Resp. Ex. B4 (record citations omitted). The First District Court of Appeal

issued a written opinion, which stated:

We affirm Appellant's judgment and sentence, and remand solely for the court to enter a written adjudication <u>nunc pro tunc</u> of the competency

determination the court has already made. See Hunter v. State, 174 So. 3d 1011, 1015 (Fla. 1st DCA 2015) (remanding for entry of nunc pro tunc written order). The record reflects that the court made a proper and independent adjudication of Appellant's competency after the court raised a competency concern and had Appellant evaluated. We reject Appellant's other arguments on appeal without further comment.

AFFIRMED; REMANDED for entry of order.

Resp. Ex. B6.[5]

In light of this record, the Court finds that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts, given the evidence presented in the state court proceedings. Ground One is denied.

**b. Ground Two**

Petitioner argues the trial court violated his "federal due process right not to be convicted while mentally incompetent for purposes of self-

---

[5] As summarized in Ground Two, on remand, the trial court complied with the First DCA's mandate and entered a written order adjudging Petitioner mentally competent. Resp. Ex. B8.

representation." Doc. 1 at 17-19. The Court construes this claim as a substantive challenge to his competency to proceed to trial. [6]

Petitioner, with help from appellate counsel, raised a similar substantive competency claim on direct appeal.[7] Resp. Ex. B3 at 34-39. In its answer brief, the state addressed the claim as follows:

> The facts in this case support the trial court's finding of competency and that no fundamental error was committed. Appellant was first evaluated by Dr. Meadows, upon the request of previous trial counsel. In October 2015, trial counsel informed the court that he had no motions based on competency because of the evaluation. [The] court conducted a <u>Nelson</u> hearing on February 29, 2016, and found trial counsel competent. The court then began a <u>Faretta</u> inquiry, but suspended it because Appellant claimed to hear voices. The trial court ordered an evaluation to help determine whether Appellant was competent to waive his right to counsel.
>
> On March 18th, 2016, the court stated on the record that the appointed expert found that while there were some psychiatric issues, Appellant was competent and exaggerating his issues. The court then began a

---

[6] Petitioner also alleges that the trial court erred in allowing Petitioner to represent himself when he was incompetent to do so and that the trial court erroneously ordered Petitioner's only competency evaluation while he was represented by counsel and failed to order another one during Petitioner's self-representation. Doc. 1 at 18. The Court addresses those subclaims in Point II of Ground Four.

[7] Petitioner also raised this substantive competency claim in his Florida Rule of Criminal Procedure 3.850 motion, which the state court denied as procedurally barred and not cognizable in a postconviction motion. Resp. Ex. C1 at 41-43. In their Response, Respondents only reference the state court's consideration of this claim during its postconviction review and fail to acknowledge Petitioner also raised this substantive competency claim on direct appeal. Resp. at 12-13. However, in considering this claim here, the Court applies deference to the state court's consideration of this claim on Petitioner's direct appeal.

Faretta inquiry. The court specifically stated, "I need to ask you a few questions about yourself, to determine if you are competent to make a knowing and intelligent waiver of counsel," and proceeded to inquire about Appellant's education, mental health, and other factors that went to Appellant's competency.

At the end of the Faretta inquiry, the court stated, "All right. The court finds that Mr. Johnson is alert, coherent, and has been responsive to my questions concerning the decision to represent himself. The Court does have some concerns, because I have twice witnessed Mr. Johnson complain of hearing voices; once when I was shadowing Judge Salvador, before I took the bench, and then again on February the 29th . . . . The first time I heard him was sometime in the middle of January of this year, 2016[,] however, he's been examined by Dr. Neidigh, who has found him to be exaggerating his ailments, and that he is competent to proceed. So, I will grant your request to represent yourself. But, understand, Mr. Johnson, that is not a granting that is forever in place. I'm going to revisit this every time I see you, and if I find that you are not competent to represent yourself, I can change my mind – well, I wouldn't change my mind, I would review this every time I see you, at every stage of the proceeding. So, again, I find that Mr. Johnson is competent to waive counsel."

It is clear from the record that the court made an independent finding of competency when it found Appellant competent to waive counsel. The trial court could not have found Appellant competent to proceed pro se, if he was not competent to proceed to trial.

This case is similar to Charles v. State, 223 So. 3d 318 (Fla. 4th DCA 2017). In that case, there was no written stipulation to rely on the contents of the doctor's report. The court found that the parties silence at the hearing "demonstrates the parties agreed to the trial court's procedure of deciding the issue of

31

> competency based on Dr. Brannon's written report alone."
>
> In the instant case, neither the State nor Appellant requested for oral testimony from an expert when the court was determining competency. Both parties were aware that the court was reviewing the expert's report to determine competency. Furthermore, at no time was Appellant found incompetent at any stage of the proceedings.

Resp. Ex. B4 at 12-14 (record citations omitted). As mentioned, the First DCA

issued a written opinion, which stated as follows:

> We affirm Appellant's judgment and sentence, and remand solely for the court to enter a written adjudication <u>nunc</u> <u>pro</u> <u>tunc</u> of the competency determination the court has already made. <u>See</u> <u>Hunter</u> <u>v. State</u>, 174 So. 3d 1011, 1015 (Fla. 1st DCA 2015) (remanding for entry of <u>nunc</u> <u>pro</u> <u>tunc</u> written order). The record reflects that the court made a proper and independent adjudication of Appellant's competency after the court raised a competency concern and had Appellant evaluated. We reject Appellant's other arguments on appeal without further comment.
>
> AFFIRMED; REMANDED for entry of order.

Resp. Ex. B6. On remand, the trial court entered a written order stating:

> This matter having come to be heard before this Court and the competency of the Defendant to proceed having been raised in accordance with the provisions of Rule 3.210(b) and 3.211, Florida Rules of Criminal Procedure, the Defendant having previously been evaluated by Dr. Larry Neidigh, the Court having reviewed the report and having heard the arguments of counsel it is
>
> **ORDERED AND ADJUDGED**:

> 1. The Defendant is hereby adjudged mentally competent to stand trial and assist his attorney in preparation of his defense.
>
> . . . .
>
> [FN1] This Order entered <u>nunc</u> <u>pro</u> <u>tunc</u> [March 18, 2016,] pursuant to Mandate issued by the First District Court of Appeal on August 16, 2018.

Resp. Ex. B8.

This Court addresses this claim under the deferential standard for federal court review of state court adjudications. To succeed on a substantive competency claim, a petitioner must show by a preponderance of the evidence that he was in fact incompetent at the relevant time. <u>Medina v. Singletary</u>, 59 F.3d 1095, 1106 (11th Cir. 1995); <u>see also</u> <u>Johnston v. Singletary</u>, 162 F.3d 630, 637 n.7 (11th Cir. 1998). The relevant standard for assessing a criminal defendant's mental competency is set forth in <u>Dusky v. United States</u>, 362 U.S. 402, 402 (1960). The <u>Dusky</u> standard requires a court to determine whether a defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him." <u>Id.</u> Whether a petitioner has the present ability to consult with his lawyer and understand the proceedings may be gleaned from the hearing and trial transcripts: "The best evidence of [a petitioner's] mental state . . . is the evidence of his behavior" at

the relevant time. See Wright v. Sec'y for Dep't of Corr., 278 F.3d 1245, 1259 (11th Cir. 2002). A petitioner must do more than assert he was suffering from a mental deficiency at the time. Indeed, "not every manifestation of mental illness demonstrates incompetence . . . ; rather, the evidence must indicate a present inability to assist counsel or understand the charges." Medina, 59 F.3d at 1107 (internal citations omitted).

Here, the record shows Petitioner was competent to proceed to trial under the Dusky standard. In February 2016, the trail court stopped Petitioner's requested Farretta inquiry and sua sponte ordered a competency evaluation because Petitioner indicated, through his words and actions, that he was "hearing voices." Resp. Ex. B1 at 445-46. Dr. Neidigh conducted the evaluation and determined Petitioner was exaggerating his mental ailments and found him competent to proceed. Id. Notably, in his report, Dr. Neidigh observed that Petitioner:

> articulated appropriately and communicated in a logical and organized fashion throughout the interview. There were no characteristic disturbances in thought processes or organization nor was his speech tangential. There were no observations of impairment in his ability to communicate which would be characteristic of a severe psychotic disorder. . . .
>
> He was initially calm, cooperative and did not display any agitation. However, during the formal mental status, while discussing his symptoms he was constantly shaking his leg, and at times his arm as well. During this interview he presented as quite

nervous and anxious with a persistent tapping of his leg for several minutes. As the interview moved to a discussion of the competency criteria, Mr. Johnson became very dramatic and theatrical, He. grabbed his head and began asking God to help him and got up and walked around the room presenting himself as if he were in severe pain. He stated this was because he was hearing the voices and could not control them. This dramatic presentation continued for several minutes before he finally sat down and continued the interview. Once the interview was resumed he gradually became cooperative and calm once again. At the end of the interview there were no more motor tics or shaking behaviors, he was calm, and he left the interview room and walked down the hall without any noticeable impairment or features.

Mr. Johnson was oriented and cognitive processes appeared to be generally intact. It is noteworthy that he did not demonstrate any difficulties in comprehension or focus other than during the discussion of competency criteria.

Resp. Ex. B1 at 330-31

During the March 18, 2016, pretrial hearing, the trial court considered Dr. Neidigh's evaluation, as well as Petitioner's representations and statements to the trial court, and found him competent to proceed. Id. The record supports the trial court's finding. While Petitioner may have suffered from mental health issues, nothing in the record supports his claim that he did not understand the nature of the proceedings or the charges against him. Instead, the record indicates he exaggerated and weaponized his psychological conditions to delay his trial and manipulate efforts to efficiently resolve his case. As such, upon

review of the record, the Court finds that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts, given the evidence presented in the state court proceedings. Ground Two is denied.

### c. Ground Three

Petitioner asserts his trial counsel was ineffective for failing to file a timely notice of intent to rely on an insanity defense. Doc. 1 at 20. Petitioner also contends his trial attorney was ineffective for failing to object to the trial court's failure to provide a written report on Petitioner's competency, as required under Florida law, resulting in Petitioner being convicted while incompetent. Id.

First, as to Petitioner's subclaim that trial counsel failed to file a timely notice of intent to rely on an insanity defense, Petitioner raised this issue in his Florida Rule of Criminal Procedure 3.850 motion. Resp. Ex. C1 at 18-21. The trial court summarily denied the claim:

> Defendant claims counsel was ineffective for failing to file a notice of intent to rely on insanity defense. Defendant argues, but for counsel's alleged deficiency he would not have chosen to proceed pro se and a reasonable probability exists that the "outcome of the proceeding would have been different." Defendant, however, does not specify which proceeding would have been altered, but for counsel's alleged deficiency.

Based on counsel's representations to the Court, after having reviewed Dr. Meadow[s]'s evaluation of Defendant, it is clear he made a strategic decision to not pursue an insanity defense after investigating said defense with a mental health expert. Defendant has failed to allege additional evidence that counsel should have investigated that would render his decision unreasonable. Thus, there is no evidence that counsel had a good-faith basis to pursue an insanity defense. Therefore, counsel cannot be deficient for failing to pursue a meritless defense.

Additionally, Defendant's claim of prejudice is also without merit because, while representing himself, he was given an opportunity to file a proper notice of intent to rely on insanity defense and he failed to perfect it. Ultimately, the Court concluded that Defendant had failed to sufficiently plead his notice of insanity defense and precluded him from raising it at trial. A defendant who chooses to represent himself has the entire responsibility for his own defense. See Behr v. Bell, 665 So. 2d 1055, 1056-57 (Fla. 1996). Thus, counsel cannot be held responsible for failing to perfect a notice of intent to rely on an insanity defense because it was Defendant who was wholly responsible, and given every opportunity, to do so. Therefore, Defendant's claim is without merit and is denied.

Resp. Ex. C1 at 43-44 (record citations omitted). Petitioner appealed, and the First DCA per curiam affirmed the denial without a written opinion. Resp. Ex. C4.

This Court addresses this subclaim under the deferential standard for federal court review of state court adjudications. Whether an attorney's actions derived from a strategic decision is an issue of fact, and the state court's decision

on that issue is presumptively correct. <u>Provenzano v. Singletary</u>, 148 F.3d 1327, 1330 (11th Cir. 1998); <u>see also</u> <u>Chandler v. United States</u>, 218 F.3d 1305, 1314, n.14 (11th Cir. 2000) ("[A] court must not second-guess counsel's strategy."). Here, the Court applies deference to the state court's finding that trial counsel made a strategic decision to not pursue an insanity defense following Dr. Meadows's evaluation, and thus, Petitioner has failed to demonstrate deficient performance. Indeed, during the trial court's <u>Nelson</u> and <u>Faretta</u> hearing on August 25, 2016, trial counsel advised the trial court that he would not file a notice related to an insanity defense because he did not have an expert witness who supported that defense. Resp. Ex. B1 at 587-88.

Likewise, Petitioner has failed to demonstrate prejudice because when he was provided with an opportunity to file a pro se notice of intent to rely on an insanity defense, Petitioner failed to file a sufficient notice and declined the trial court's offer to appoint an expert that may have helped Petitioner obtain the information needed to file a sufficient notice. Thus, the state court's adjudication of this <u>Strickland</u> claim is neither contrary to nor an unreasonable application of clearly established federal law. And the state court's decision did not rely on an unreasonable determination of the facts, given the evidence presented in the state court proceeding. This subclaim is due to be denied.

Second, as to Petitioner's argument that his trial attorney was ineffective for failing to object to the trial court's failure to provide a written report on

Petitioner's competency, this subclaim appears to be unexhausted and procedurally barred. Petitioner did not raise this issue in his Rule 3.850 motion, and he does not provide any information in his Petition indicating he presented this issue to the state court through another avenue. Respondents also do not mention this subclaim in their Response and Petitioner does not mention it in his Reply. In any event, for the reasons previously stated, the record shows Petitioner was competent at the time of trial, rendering any further objection unnecessary. And, at the direction of the First DCA following Petitioner's direct appeal, the trial court entered a written order adjudicating Petitioner competent to proceed to trial. Resp. Ex. B8. Thus, even assuming this subclaim were exhausted, it is meritless. Ground Three is denied.

### d. Ground Four

Petitioner raises three subclaims, all of which are based on allegations of ineffective assistance of appellate counsel. See Doc. 1 at 21-26.

### *Point I*

Petitioner argues his appellate counsel was ineffective for failing to raise on direct appeal a claim that the trial court erred under § 916.12(2), Florida Statutes, when it appointed only one expert (Dr. Neidigh) to conduct his competency evaluation rather than appointing two experts. Doc. 1 at 23-24. He also alleges appellate counsel should have challenged the trial court's sole reliance on trial counsel's stipulation when finding Petitioner competent to

stand trial, as well as its failure to memorialize its findings in a written order. Id. at 23-24.

Following Petitioner's convictions and direct appeal, he filed a petition with the First DCA raising these allegations of ineffective assistance of appellate counsel. Resp. Ex. F1 at 26. The First DCA issued an opinion stating the petition was "denied." Resp. Ex. F2.

Thus, the Court addresses Petitioner's ineffective assistance of appellate counsel claims under the deferential standard for federal court review of state court adjudications. In doing so, the Court gives considerable deference to appellate counsel's strategic decision of selecting the issues to raise on appeal. The danger of raising weaker issues in a "kitchen-sink" approach is that it detracts from the attention an appellate court can devote to the stronger issues and reduces appellate counsel's credibility. See Miller v. Keeney, 882 F.2d 1428, 1434 (9th Cir. 1989); see also McBride v. Sharpe, 25 F.3d 962, 973 (11th Cir. 1994). Thus, effective appellate attorneys "will weed out weaker arguments, even though they may have merit." Philmore, 575 F.3d at 1264; see also Overstreet, 811 F.3d at 1287. Appellate counsel's failure to raise a meritless or weaker issue does not constitute deficient performance. See Brown v. United States, 720 F.3d 1316, 1335 (11th Cir. 2013) (citing Jones v. Barnes, 463 U.S. 745, 754 (1983)); Owen, 568 F.3d at 915. Prejudice results only if "the neglected claim would have a reasonable probability of success on appeal." Philmore, 575

F.3d at 1264-65.

As to his first allegation, while § 916.12(2) may contain a requirement that "[a] defendant must be evaluated by no fewer than two experts before the court commits the defendant . . .," the trial court's failure to appoint two experts to conduct a competency evaluation did not result in a federal constitutional violation. Indeed, in interpreting a similar requirement in the former version of Florida Rule of Criminal Procedure 3.210(b), the Florida Supreme Court held that "the failure to appoint a second expert to examine the defendant's mental competency to stand trial is not fundamental error. It is procedural in nature and does not go to the foundation of the case or to the merits of the cause of action." D'Oleo-Valdez v. State, 531 So. 2d 1347, 1348 (Fla. 1988). Thus, Petitioner cannot show that had appellate counsel made this argument, the outcome of his appeal would have been different.

As to Petitioner other allegations, the record shows the trial court did not solely rely on trial counsel's stipulation when finding Petitioner competent but appointed an expert to evaluate Petitioner and then relied on that expert's findings and Petitioner's representations during the March 18, 2016, Faretta inquiry to find Petitioner competent to stand trial. See Resp. Ex. B1 at 439-73. Also, while the trial court did not initially memorialize its competency finding in a written order, the First DCA's written opinion affirming Petitioner's judgment and convictions directed the trial court to issue those written findings

41

on remand but otherwise found that the trial court "made a proper and independent adjudication of [Petitioner's] competency . . . ." <u>See</u> Resp. Ex. B6. The trial court then issued a <u>nunc pro tunc</u> written order adjudging Petitioner mentally competent. Resp. Ex. B8. Consequently, Petitioner cannot show that had appellate counsel made these arguments, the outcome of his appeal would have been different. Upon thorough review of the record and the applicable law, the Court finds that the state court's decision to deny Petitioner's allegations was neither contrary to nor an unreasonable application of <u>Strickland</u>, and it was not based on an unreasonable determination of the facts given the evidence presented to the state court. Point I of Ground Four is denied.

### *Point II*

Petitioner alleges his appellate counsel was ineffective for failing to raise a claim on direct appeal challenging the trial court's failure to order a second competency hearing after it revoked Petitioner's right to proceed pro se on July 15, 2016; and a claim challenging its reliance on Dr. Neidigh's evaluation a second time when finding Petitioner was again competent to represent himself on August 25, 2016. Doc. 1 at 24.

Petitioner raised these issues in his petition filed with the First DCA. Resp. Ex. F1 at 23. The First DCA issued an opinion stating the petition was "denied." Resp. Ex. F2.

Thus, the Court addresses Petitioner's ineffective assistance of appellate

counsel claims under the deferential standard for federal court review of state court adjudications. In doing so, the Court again gives considerable deference to appellate counsel's strategic decision of selecting the issues to raise on appeal. Indeed, a state trial court can find that a petitioner is competent to proceed to trial under the <u>Dusky</u> standard but deny or revoke that petitioner's self-representation right because the petitioner lacks the mental capacity to conduct his trial defense unless represented. <u>See</u> <u>Indiana v. Edwards</u>, 554 U.S. 164 (2008) ("The Constitution does not prohibit States from insisting upon representation by counsel for those competent enough to stand trial but who suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves."). Here, the trial court revoked Petitioner's request to proceed pro se and reappointed the Public Defender's Office during the July 15, 2016, pretrial hearing because Petitioner appeared to be in physical distress and advised the trial court that he was "hearing voices." <u>See</u> Resp. Ex. B1 at 555-60. Petitioner immediately objected to the trial court's decision, advised the trial court that he suddenly did not hear any "voices," and asked for the appointment of conflict counsel because his prior appointed public defender refused to file a notice of intent to pursue an insanity defense. <u>Id.</u> at 561. The trial court denied Petitioner's request for conflict counsel. <u>Id.</u>

At the next pretrial hearing on August 25, 2016, Petitioner again requested a <u>Nelson</u> inquiry, and when the trial court found counsel was not

acting ineffective, Petitioner asked to represent himself. <u>Id.</u> at 590. The trial court then conducted a <u>Faretta</u> inquiry, during which it considered the lengthy history of the case, Petitioner's past requests to represent himself, Dr. Neidigh's competency evaluation, and Petitioner's representations to the trial court during the inquiry. <u>Id.</u> at 590-607. Notably, during the August 25, 2016, <u>Faretta</u> inquiry, Petitioner advised the trial court that he was "very lucid and [knew] what [he was] talking about and [he knew he] want[ed] to represent [himself]." <u>Id.</u> at 604. He also advised the trial court that he stopped hearing voices as soon as it reappointed the Public Defender's Office. <u>Id.</u> at 606.

Based on this record, the Court finds no reasonable basis for appellate counsel to challenge the trial court's actions during either the July 15, 2016, hearing or the August 25, 2016, hearing. And Petitioner cannot show that had appellate counsel pursued Petitioner's proposed arguments, the outcome of his appeal would have been different. As such, upon thorough review of the record and the applicable law, the Court finds that the state court's decision to deny Petitioner's allegations was neither contrary to nor an unreasonable application of <u>Strickland</u>, and it was not based on an unreasonable determination of the facts given the evidence presented to the state court. Point II of Ground Four is denied.

*Point III*

Petitioner again argues that appellate counsel was ineffective for failing to raise on direct appeal a claim challenging the trial court's reliance on trial counsel's stipulation of competency. Doc. 1 at 25-26. The Court addressed this issue in Point I above. Thus, for the reasons already stated, Point III of Ground Four is denied.

Accordingly, it is

**ORDERED AND ADJUDGED:**

1.     The Petition (Doc. 1) is **DENIED** and this case is **DISMISSED WITH PREJUDICE**.

2.     The **Clerk** shall enter judgment dismissing this case with prejudice, terminate any pending motions, and close the file.

3.     If Petitioner appeals this denial, the Court denies a certificate of appealability. Because this Court has determined that a certificate of appealability is not warranted, the Clerk shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed

in this case. Such termination shall serve as a denial of the motion.[8]

**DONE AND ORDERED** at Jacksonville, Florida, this 9th day of September, 2024.



TIMOTHY J. CORRIGAN
United States District Judge

Jax-7

C:    Walter L. Johnson, #M84058
      Counsel of record

---

[8] The Court should issue a certificate of appealability only if the Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," <u>Tennard v. Dretke</u>, 542 U.S. 274, 282 (2004) (quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 335-36 (2003) (quoting <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 n.4 (1983)). Here, after consideration of the record as a whole, the Court will deny a certificate of appealability.